*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PLAINFIELD CHARTER TOWNSHIP,

        Plaintiff-Appellee,

v

BRUCE LING,

        Defendant,

and

MICHAEL J. LAMMERS,

        Defendant-Appellant.

UNPUBLISHED
September 5, 2024

No. 365174
Kent Circuit Court
LC No. 21-009443-CZ

Before: SWARTZLE, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

This case concerns an agreement for defendant-appellant, Michael J. Lammers, to sell his flood-prone residential property to plaintiff-appellee, Plainfield Charter Township (the Township), under a grant program funded by the Federal Emergency Management Agency (FEMA). It particularly involves Lammers' alleged breach of contract for not returning duplicate benefits he received regarding a 2013 flood.

Lammers appeals as of right the trial court's $39,522.25 judgment entered in favor of the Township, which followed the trial court's order granting the Township's motion for summary disposition under MCR 2.116(C)(9) (failure to plead valid defense) and MCR 2.116(C)(10) (no genuine issue of material fact). On appeal, Lammers argues that the Township's breach-of-contract action was preempted by federal law, and the trial court otherwise erred by finding that he breached the agreement with the Township. Lammers also asserts that the court erred by denying his motion to disqualify the trial judge. Lastly, Lammers argues that the trial court abused its discretion by awarding the Township attorney fees as a sanction concerning his motion for disqualification and objections to a proposed order. We reject the majority of Lammers' claims,

-1-

but conclude that the trial court erred by deciding this case as a matter of law.  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL HISTORY

The FEMA grant underlying the property-sale agreement at issue, which was administered by the Michigan Department of State Police (MSP), provided the Township with funding to purchase homes located in a floodplain along the Grand River.  The purpose of the grant was to remove the homes and other structures so the area could return to a natural floodplain or become part of an open-space park area to mitigate damage from future flooding.

Lammers owned a two-bedroom home he purchased in 2007.  In April 2013, the house and outbuilding on the property were damaged by significant flooding.  Lammers had flood insurance through the National Flood Insurance Program, which was backed by FEMA.  He received $52,300 after the flood, the policy's coverage limit.

The 2013 flood was federally declared a disaster on June 18, 2013, and the Township received a Hazard Mitigation Grant from FEMA under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the Stafford Act), 42 USC 5121 *et seq*.  Lammers' property was included on a list of 14 flood-prone properties along the Grand River desired for purchase by the Township.  Lammers decided to sell his property to the Township under the grant program.  After the property was appraised, the Township and Lammers entered into an agreement for the sale of the property for $40,500, which was 75% of its appraised preflood value.

The agreement contained the following pertinent provisions:

> 3. Seller represents—
>
> a) Seller qualifies for the assistance granted.
>
> b) Seller understands no obligation to sell the Property exists.
>
> c) Seller chooses to voluntarily sell Property to Sub-grantee.  Attached to this Offer to Sell Real Property and Acceptance is a Statement of Voluntary Participation which is incorporated by reference.
>
> * * *
>
> 6. *FEMA Hazard Mitigation Grant Program funds being used for the purchase of Property cannot and will not duplicate benefits received from other sources of funds.  Seller will return any disaster aid money received if any such money results in a duplication of benefits.*
>
> * * *
>
> 13. The Buyer's obligation to consummate this transaction is contingent upon Sub-grantee being satisfied, in its sole discretion that it is eligible for reimbursement of the purchase price through the grant program identified above

and receipt of said funds from Grantee. Said contingency is waived unless Sub-grantee gives Seller written notice of its intent to terminate the agreement within 14 days of receipt of the purchase money from Grantee. [Emphasis added.]

The sale was finalized on March 29, 2016. Later, during the finalization of the grant, the MSP discovered that "duplicate benefits" were paid to the owners of three different properties, including Lammers. Scott Stockert, a hazard mitigation analyst who worked in the grants and finance department of the MSP, explained that the duplication of benefits generally referred to a participant receiving multiple funds for the same purpose. For example, a homeowner who received money from an insurance claim as the result of an event that caused property damage and through the grant program also received the value at which the property was appraised before the event—in this case, the 2013 flood—would receive duplicate benefits *if* the money from the insurance claim was not used to make the repairs that were specified in the claim. If the homeowner used the proceeds from the insurance claim to make the specified repairs, however, participation in the grant program would not result in duplicative benefits.

The township's floodplain manager was informed about the issue concerning duplicative benefits, and he contacted Lammers for documentation verifying the receipt and use of the insurance proceeds. Lammers did not respond, and the Township then requested repayment for $40,500—the amount it paid for the property.[1] Lammers refused.

The Township filed a complaint against Lammers alleging breach of contract and unjust enrichment. After discovery, the trial court granted summary disposition in favor of the Township as to its breach-of-contract claim. Further, Lammers moved to disqualify the trial judge, but the court declined to rule on that motion because defense counsel failed to attend the hearing. The trial court later granted the Township's request for attorney fees because defense counsel failed to attend the hearing for the motion to disqualify and filed frivolous objections to the Township's proposed judgment after the disqualification hearing. Lammers was ordered to pay attorney fees in the amount of $822.50. This appeal followed.

II. ANALYSIS

A. STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary disposition de novo. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2001). A party may move for summary disposition under MCR 2.116(C)(9) "when the opposing party has failed to state a valid defense to the claim asserted against him or her." *Findling v Auto-Owners Ins Co*, 343 Mich App 548, 558; 997 NW2d 733 (2022) (quotation marks and citation omitted). "When deciding a motion under MCR 2.116(C)(9), which tests the sufficiency of a defendant's pleadings, the trial court must

---

[1] When the Township filed its amended complaint, it requested reimbursement for $52,300, which was the amount Lammers received from the insurance claim. The Township later amended its request for reimbursement to $39,225, 75% of the insurance proceeds, because the grant only funded 75% of the total eligible expenditures.

accept as true all well-pleaded allegations and properly grants summary disposition" when a defendant fails to plead a valid defense to a claim. *Id*. (quotation marks and citation omitted). However, when a plaintiff moves for summary disposition under MCR 2.116(C)(9) and (C)(10) and the trial court considers materials outside the pleadings, as occurred here, we construe the motion as having been granted under (C)(10). *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007).

When reviewing a motion brought under MCR 2.116(C)(10), this Court "must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence in favor of the party opposing the motion." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 202; 544 NW2d 727 (1996). This Court's "task is to review the record evidence, and all reasonable inferences drawn from it, and decide whether a genuine issue regarding any material fact exists to warrant a trial." *Id*. A genuine issue of material fact exists when the record, "would leave open an issue upon which reasonable minds might differ." *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 609; 566 NW2d 571 (1997). However, the trial court may not "assess credibility" or "determine facts on a motion for summary [disposition]." *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

## B. PREEMPTION

First, Lammers argues that the Township's breach-of-contract claim was preempted by federal law, depriving the Township of standing to pursue its claim. We disagree.

"Issues of law, such as federal preemption of state law, are reviewed de novo." *Packowski v United Food & Commercial Workers Local 951*, 289 Mich App 132, 138; 796 NW2d 94 (2010), overruled on other grounds by *Foster v Foster*, 509 Mich 109, 126 n 9; 983 NW2d 373 (2002) (*Foster II*), mod by 509 Mich 988 (2022). "The Supremacy Clause of the United States Constitution gives Congress the authority to preempt state laws." *Id*. at 139. This provision states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. [US Const, art VI, cl 2.]

As a result, "this Court is bound by federal statutes, despite any state law to the contrary." *Packowski*, 289 Mich App at 139.

"Whether a federal statute preempts a state-law claim is a question of federal law." *Id*. "Preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 140 (quotation marks and citation omitted). "Preemption can also occur when a state or local regulation prevents a private entity from performing a function that Congress has tasked it with performing." *Id*.

In *Foster II*, 509 Mich at 126 n 9,[2] the Michigan Supreme Court adopted the analysis concerning federal preemption in the concurring opinion by Justice Viviano in *Foster v Foster*, 505 Mich 151, 181-188; 949 NW2d 102 (2020) (*Foster I*) (VIVIANO, J., concurring).

Justice Viviano wrote in this concurrence, "It is well settled that [s]tate courts are adequate forums for the vindication of federal rights." *Foster I*, 505 Mich at 181 (VIVIANO, J., concurring) (quotation marks and citation omitted; second alteration in original). In *Foster I*, 505 Mich at 183, Justice Viviano cited with approval this Court's analysis in *Marshall v Consumers Power Co*, 65 Mich App 237, 244-245; 237 NW2d 266 (1976), which provided:

> Where preemption exists, however, state courts will not always be prevented from acting. A litigant may still enforce rights pursuant to the Federal law in state courts unless the Constitution or Congress has, expressly or impliedly, given a Federal court exclusive jurisdiction over the subject matter. Thus, we must determine whether Congress has preempted states from legislating or regulating the subject matter of the instant case, and, if it has, whether it has also vested exclusive jurisdiction of that subject matter in the Federal court system. [Citations omitted.]

Justice Viviano went on to explain that "state courts are only deprived of jurisdiction when Congress has designated a federal forum for resolution of the class of disputes at issue." *Foster I*, 505 Mich at 188 (VIVIANO, J., concurring).

Here, the grant that the Township received was governed by the Stafford Act, which prohibits the duplication of disaster benefits. 42 USC 5155(a) states:

> The President, in consultation with the head of each Federal agency administering any program providing financial assistance to persons, business concerns, or other entities suffering losses as a result of a major disaster or emergency, shall assure that no such person, business concern, or other entity will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source.

Moreover, when the parties entered into the sales agreement, federal regulations prohibited the duplication of benefits concerning the FEMA grant program at issue:

> Grant funds may not duplicate benefits received by or available to applicants and other project participants from insurance, other assistance programs, legal awards, or any other source to address the same purpose. Such individual or entity must notify the subapplicant and FEMA of all benefits that it receives, anticipates, or has available from other sources for the same purpose. FEMA will

---

[2] In *Foster II*, 509 Mich at 126, 131, the Michigan Supreme Court held federal preemption did not deprive the state court of subject-matter jurisdiction in a case concerning the division of military disability benefits in a divorce action.

reduce the subgrant award by the amounts available for the same purpose from another source. [44 CFR 80.9(c).[3]]

42 USC 5155(c) also provides for the recovery of duplicative benefits:

> A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source. The agency which provided the duplicative assistance shall collect such duplicative assistance from the recipient in accordance with [31 USCS §§ 3701 *et seq*.], relating to debt collection, when the head of such agency considers it to be in the best interest of the Federal Government.

Lammers argues that the Township did not have standing to bring an action in the state court because 42 USC 5157 states that such an action can only be brought by the attorney general in a federal district court. In pertinent part, 42 USC 5157 states:

> (a) Any person who knowingly misapplies the proceeds of a loan or other cash benefit obtained under this Act shall be fined an amount equal to one and one-half times the misapplied amount of the proceeds or cash benefit.

> (b) Whenever it appears that any person has violated or is about to violate any provision of this Act, including any civil penalty imposed under this Act, the Attorney General may bring a civil action for such relief as may be appropriate. Such action may be brought in an appropriate United States district court.

In this case, the Township sought repayment for the amount that the grant was reduced because of Lammers' alleged receipt of duplicative benefits as provided by 44 CFR 80.9(c). Specifically, the Township alleged that Lammers breached the sales agreement by accepting duplicate benefits after the 2013 flood, thus reducing the Township's grant award, and by rejecting the Township's request for reimbursement. To the extent that Lammers violated provisions of the Stafford Act in securing the grant and/or refusing the Township's request for reimbursement, 42 USC 5157(b) states that the attorney general *may* bring a civil action in a federal district court against such a person. But we do not believe that this provision forecloses a state breach-of-contract action brought by a subrecipient for damages it allegedly suffered under a sales agreement entered with a third-party seller.

Notably, when the Township sought reimbursement and later filed suit, FEMA had already reduced its award to the Township because of the duplication of benefits, as required by 44 CFR 80.9(c). And this case involves the distinct harm to the Township for Lammers' refusal to refund duplicate benefits after FEMA reduced the Township's grant award. Therefore, 42

---

[3] This regulation has since been amended, but that amendment does not alter the outcome of this appeal.

USC 5157 does not provide a federal forum for the type of breach-of-contract action at issue here, and we conclude that the state circuit court had jurisdiction over this case. See *Foster II*, 509 Mich at 130; see also *Mahnick v Bell Co*, 256 Mich App 154, 158; 662 NW2d 830 (2003) (explaining that the plaintiff asserted a common-law breach-of-contract claim, and because the statutory remedies established by the Wages and Fringe Benefits Act were cumulative to any common-law remedy for breach of contract, the trial court erred by failing to apply common-law principles governing such claims).

In *Foster II*, which involved the state court's division of veteran's benefits in a divorce action, the Court acknowledged that (1) "appellate jurisdiction from a decision by the Secretary [of Veterans Affairs] is limited to the federal courts," and (2) federal law "provides for a process of requesting apportionment of veteran's benefits." *Id*. at 129-130. But it elaborated that "the trial court in this case was not reviewing a decision of the Secretary of Veterans Affairs . . . ." "Therefore, contrary to [the] defendant's assertion, there is no exclusive federal forum for dividing military disability benefits in divorce actions. We agree with [the] plaintiff that 38 USC 511 . . . does not refer to, restrict, or displace state court jurisdiction." *Id*. at 130. The Court ultimately held that "federal preemption under 10 USC 1408 and 38 USC 5301 does not deprive our state courts of subject-matter jurisdiction over a divorce action involving the division of marital property." *Id*. Here, as in *Foster II* and analogous to the ruling in *Mahnick*, we conclude that Congress has not designated an exclusive federal forum for resolution of the class of contract disputes at issue here. See *Foster I*, 505 Mich at 188 (VIVIANO, J., concurring).

Lammers further argues that even if there was no federal preemption issue in this case, he did not receive duplicative benefits because the benefits from his insurance claim were not for the same purpose or the same disaster loss as those from the grant program. He specifically asserts the following:

> Flood insurance proceeds are separate and distinct from the Hazard Mitigation Grant Program, which includes, *inter alia*, the purchase and removal of structures in a floodplain. The $40,500 price paid by [the Township] to purchase the property pursuant to the Flood Mitigation grant program w[as] three years apart and did not provide the same benefits for the same disaster or loss as the 2013 flood insurance proceeds, which were to repair the property.

Lammers argues that while flood insurance benefits relate to a specific disaster loss, here the 2013 flood, the grant benefits at issue relate to mitigating the risk of future damage.

There is little, if any, authority to guide us on this matter, federal or otherwise. As an initial matter, setting aside the specific grant program at issue, we agree with Lammers that funds for remediation of a property serve a distinct purpose from those for mitigation of future damage. See *Calgero v Shows, Cali & Walsh, LLP*, 614 F Supp 3d 384, 391-392 (ED La, 2022)[4] (noting that a grant intended "*to compensate for damages incurred and* to mitigate against future damages" after Hurricane Katrina required that the grantor "subtract[] FEMA and insurance payments to avoid

---

[4] Although we are not bound by the opinions of federal district courts, they may be considered for their persuasive value. *Johnson v VanderKooi*, 502 Mich 751, 764 n 6; 918 NW2d 785 (2018).

awarding 'duplicate benefits.' ") (emphasis added), rev'd on other grounds ___ F 3d ___ (CA 5, 2024) (Docket No. 22-30487).

But this distinction is not so clear cut in this case, and we nevertheless reject Lammers' argument given how the grant here was structured and distributed. Specifically, while the grant at issue was generally intended for the purpose of future mitigation—as opposed to the insurance proceed Lammers received that were meant to remediate damage from the 2013 flood—the grant award and resultant purchase of Lammers' property still implicitly provided benefits related to remediation from the 2013 flood because the purchase price was on the basis of the home's preflood value. The grant benefits Lammers received thus accounted for Lammers' having rehabilitated the property with his 2013 insurance proceeds, but he was unable to provide any records of using the insurance funds in this manner.

Here, Stockert testified in his deposition that a duplication of benefits attributable to Lammers' property resulted in a reduced payment to the Township. He explained the nature of the duplication at issue as follows:

> So if you have a homeowner in this case that happens to be involved—have flood insurance. The flood insurance is backed by an association with FEMA . . . . But it's part of the NFIP, [the] National Flood Insurance Program, which is the underwriter for most, if not all flood insurance.

> And so if a person, or if a homeowner were to receive a c1aim based on an event where there was damage to that property, and that claim states that this money is for the repair of the building, so specific things within that structure, and that structure—and those things weren't done with the money, and then that homeowner were to get—participate in a Hazard Mitigation Assistance Grant for acquisition, for that property, and that property was appraised at a pre-event value, so related to that same event the caused that damage, that related to the flood—the insurance claim, a duplication would be if they received money for both those things.

> And that money that was from the claim was not used to make the repairs that were specified in the claim.

Stockert explained that such a duplication only occurs "if [the property] was being appraised at pre-event value, which means . . . [the] value of what that house would have been worth[] if it wasn't damaged by the flood." "If it's [the] current value, so with the damages, with whatever state it is at that moment, then, no, it would not be a duplication of benefits." And he said that "the homeowner, the community" should initially determine whether there is a duplication of benefits regarding a specific property, which is verified by the state and FEMA. Stockert testified further that Hazard Mitigation Assistance Grants are "tied specifically" to declared disasters, like the 2013 flood at issue, "to hopefully reduce the cost—the damage caused by future similar disasters." Stockert also stated that the Township applied for the grant here in 2013, which was explicitly related to the 2013 flood.

To the extent Lammers argues that the requirements of 44 CFR 80.9(c) only apply to grant recipients like the Township, not homeowners like himself, we disagree. Although Lammers

emphasizes that the Township never sought information related to any duplication of benefits until three years after closing, 44 CFR 80.9(c) unequivocally applies to "applicants," i.e., the Township, "*and* other project participants" (emphasis added), i.e., Lammers. "Such individual or entity *must* notify the subapplicant [here, the Township] and FEMA of all benefits that it receives, anticipates, or has available from other sources for the same purpose." 44 CFR 80.9(c) (emphasis added). In sum, the Township's breach-of-contract claim was not preempted by federal law, and we reject Lammers' alternate argument under this issue regarding duplicative benefits.

## C. BREACH OF CONTRACT

Next, Lammers argues that the trial court erred by granting the Township's motion for summary disposition as to its breach-of-contract claim. We reject the majority of Lammers' arguments on this issue, but agree that the trial court erred by deciding this case as a matter of law.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 393; 964 NW2d 846 (2020) (quotation marks and citation omitted).

> The goal of contract interpretation is to determine and enforce the parties' intent on the basis of the plain language of the contract itself. The words of a contract are interpreted according to their plain and ordinary meaning, and this Court gives effect to every word, phrase, and clause while avoiding interpretations that would render any part of the document surplusage or nugatory. If a contract incorporates another document by reference, the two writings should be read together. Ultimately, this Court enforces clear and unambiguous language as written. [*Id*. (quotation marks and citations omitted).]

Here, there was indisputably a contract between the parties. But Lammers argues that the parties' sales agreement was extinguished and merged into the warranty deed pursuant to the sale's closing on March 29, 2016. According to Lammers, his obligations ceased with the delivery of the deed on that date.

"Under the merger doctrine, a deed made in full execution of a contract for the sale of land is presumed to merge the provisions of a preceding contract pursuant to which it is made, including all prior negotiations and agreements leading up to execution of the deed . . . ." *Johnson Family LP v White Pine Wireless, LLC*, 281 Mich App 364, 374-375; 761 NW2d 353 (2008) (quotation marks and citation omitted; ellipsis in original). However, "this rule is not absolute." *Id*. at 375. "For example, Michigan courts have long recognized that, where delivery of the deed represents only part performance of the preceding contract, the unperformed portions are not merged in it." *Id*.

In *Chapdelaine v Sochocki*, 247 Mich App 167, 172; 635 NW2d 339 (2001), this Court held that an easement provision in a purchase agreement could not be fulfilled "until after the deed was delivered and, therefore, was not fulfilled by the deed." This Court explained that because the deed that the plaintiff delivered to the defendants "did not constitute full performance of the

easement provision in the purchase agreement, the doctrine of merger did not apply" to extinguish the plaintiff's express easement reservation. *Id*.

The critical contract language at issue here required the seller, Lammers, "to return any disaster aid money received if any such money results in a duplication of benefits." Lammers also represented that he qualified for the assistance granted. And as part of the closing documents, Lammers agreed, albeit with FEMA and not the Township, to "return any disaster aid money I received from FEMA or the State if I receive insurance or other money for the same loss, or if I do not use FEMA disaster aid money for the purpose for which it was intended." Importantly, any issue concerning the return of duplicative benefits could not arise until after the closing of the property. Lammers did not receive the alleged duplicative benefits until the sale of the property was final and he received funds under the grant program. Any requirement that Lammers return duplicative benefits thus would not have arisen until after this point. Therefore, the requirement that Lammers return duplicative funds was not merged and extinguished by the warranty deed. See *id*.

Lammers further argues that the trial court erred by granting the Township's motion for summary disposition because the information in Lammers' affidavit was unrefuted. Lammers stated in his affidavit that he did not know the insurance proceeds he received in 2013 after the flood were related to his participation in the grant program, and that he used the insurance proceeds to make repairs to the house. And Stockert critically testified that a duplication of benefits only exists concerning insurance proceeds when the money "was *not* used to make the repairs that were specified in the claim." (Emphasis added.) Given this evidence, we conclude that a question of fact exists concerning whether Lammers received duplicate benefits as necessary to support the Township's claim. By premising its decision on the fact that a duplication occurred concerning the totality of Lammers' insurance proceeds, the trial court implicitly rejected Lammers' credibility and decided a disputed factual issue. This is improper when deciding a motion for summary disposition. See *Skinner*, 445 Mich at 161.

We acknowledge that Lammers also averred as follows, "Since I did the [repair] work myself, . . . there was money left over that I used to pay off the mortgage." But it remains for a trier of fact to determine the extent of repairs made, if any, and the resultant extent of the duplication in this case.

We reject Lammers' remaining arguments. While the extent of any duplicative benefits presents a question of fact to be resolved at trial, the trial court—assuming *arguendo* that duplicative benefits were received—was correct that Lammers breached the requirement in the sales agreement that he return aid that resulted in duplicative benefits. When the Township became aware of the issue concerning the possible duplication of benefits, the Township contacted Lammers and requested either documentation showing that he used the insurance proceeds to repair the home, which would abrogate the duplication issue, or return of the insurance proceeds. Lammers provided neither. As a result, the amount of the grant award that the Township received from FEMA was reduced. Accordingly, assuming a duplication of benefits in fact occurred, the Township established its breach-of-contract claim. See *Bayberry Group, Inc*, 334 Mich App at 393.

Contrary to Lammers' claim that the Township failed to establish its damages that resulted in the breach, Stockert testified in his deposition that the eligible project costs were decreased by $52,300 because of the duplicated benefits attributable to the property, and that the Township would have been eligible for at least 75% of that $52,300. $52,300 was the amount that Lammers received from his insurance claim after the 2013 flood. If Lammers had accounted for or returned the $52,300, then there would not have been a duplicative-benefits issue. Accordingly, the Township established its damages in the amount of $39,225—75% of $52,300. But we nevertheless reverse the trial court's damage award because remand for a trial is warranted.[5]

Lammers' claim that the trial court improperly considered parol evidence is similarly without merit.

> The parol evidence rule may be summarized as follows: [p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous. This rule recognizes that in [b]ack of nearly every written instrument lies a parol agreement, merged therein. The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing. In other words, the parol evidence rule addresses the fact that disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts. [*Hamade v Sunoco, Inc*, 271 Mich App 145, 166-167; 721 NW2d 233 (2006) (quotation marks and citations omitted; alterations in original).]

In this case, Lammers argues that the trial court improperly considered parol evidence by referring to the FEMA Declaration and Release that Lammers signed on the day of the closing. However, the court only considered this document in its analysis of Lammers' merger claim. The trial court observed that, even if the sales agreement merged with the warranty deed, Lammers also signed the Declaration and Release, which included the certification that "I will return any disaster aid money I received from FEMA or the State if I receive insurance or other money for the same loss, or if I do not use FEMA disaster aid money for the purpose for which it was intended." Moreover, the Declaration and Release did not contradict the language of the sales agreement. See *id*. Therefore, the trial court did not err by considering parol evidence in its analysis of the breach-of-contract claim.

Lammers raises several additional defenses to the Township's breach-of-contract claim. First, Lammers contends that the Township cannot maintain the contract action because the Township was the first to breach the contract by not ensuring that it was entitled to grant reimbursement under ¶ 13 of the sales agreement. "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent

---

[5] The available evidence supported the trial court's damage calculation, but only if accepting that Lammers received duplicative benefits related to the totality of his insurance claim. If a trier of fact concludes otherwise, however, the damages after trial would need to be reduced accordingly.

breach or failure to perform. . . . [This] rule only applies when the initial breach is substantial." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 729-730; 957 NW2d 858 (2020) (quotation marks and citation omitted; ellipsis in original).

As previously discussed, a breach occurred if, in fact, Lammers accepted duplicative benefits related to the same event and then failed to return those funds. Under this scenario, the Township did not first breach the contract by failing to inquire whether Lammers was qualified to participate in the grant program. Indeed, ¶ 3(a) stated that the *seller* represented that he or she was qualified for the assistance. And ¶ 13, on which Lammers relies, exempts the buyer from its obligation to buy when not satisfied that it is eligible for reimbursement of the purchase price, but includes no affirmative duty for the seller to do anything to confirm such eligibility. Moreover, once the Township was informed that there was an issue concerning the duplication of benefits, it contacted Lammers and asked for documentation or a return of the insurance proceeds, which would have remedied the issue. Accordingly, any failure of the Township to investigate Lammers' qualification did not amount to a substantial breach excusing Lammers' responsibility to perform under the sales agreement. See *id*.

Next, Lammers asserts that the Township cannot sustain its breach-of-contract claim because of unclean hands. Specifically, Lammers contends that the Township has not maintained the property as unimproved park land. Lammers alleges that there are "junk" vehicles parked on the property that would cause a hazard during another flood. However, the doctrine of unclean hands is an equitable defense, and "[a]n action for damages for breach of contract is historically an action at law, not in equity." *Stroud v Glover*, 120 Mich App 258, 261; 327 NW2d 462 (1982). See also *Waldorf v Zinberg*, 106 Mich App 159, 165; 307 NW2d 749 (1981) (stating that the defendant could "not raise the equitable defense of unclean hands as to [the] plaintiffs' request for a determination of their legal rights").

Finally, Lammers argues that the Township is barred from enforcing the sales agreement against him under the doctrine of laches. "Laches is an affirmative defense based primarily on circumstances that render it inequitable to grant relief to a dilatory plaintiff." *Bayberry Group, Inc*, 334 Mich App at 410. "The doctrine of laches arose from the requirement that a complainant in equity must come to the court with a clean conscience, in good faith, and after acting with reasonable diligence." *Id*. "If a plaintiff has not exercised reasonable diligence in vindicating his or her rights, a court sitting in equity may withhold relief on the ground that the plaintiff is chargeable with laches." *Id*. (quotation marks and citation omitted). "Although timing is important, laches is not triggered by the passage of time alone; rather, it is the prejudice occasioned by the delay that justifies application of the doctrine to bar a claim." *Id*. "The defendant bears the burden of proving that the plaintiff's lack of diligence prejudiced the defendant sufficiently to warrant application of the doctrine of laches." *Id*.

The Township's breach-of-contract claim was not barred by laches. Although three years passed between the sale of the property and when the Township contacted Lammers concerning the duplication-of-benefits issue, the Township contacted Lammers immediately after it was informed of the issue by the MSP. Paragraph 6 of the sales agreement provided that benefits could not be duplicated and that such benefits would have to be returned. Lammers also signed the Declaration and Release, which provided that Lammers would return any disaster-aid money that he received from FEMA or the State if he received insurance or other money for the same loss.

And the issue could have been remedied if Lammers provided the proper documentation or returned the insurance funds. Therefore, the doctrine of laches was not applicable under the circumstances in this case. See *id*.

## D. JUDICIAL BIAS

Lammers also argues that the trial court judge was biased against him because the judge had personal knowledge of disputed facts in the case. We disagree.

"Due process requires that an unbiased and impartial decision-maker hear and decide a case." *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW 2d 153 (2012). "A trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Id*. According to MCR 2.003(C)(1), disqualification of a judge is warranted for the following pertinent reasons:

> (a) The judge is biased or prejudiced for or against a party or attorney.

> (b) The judge, based on objective and reasonable perceptions, has either (*i*) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, 556 US 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (*ii*) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

> (c) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

Lammers asserts that the trial judge was biased and/or prejudiced by his previous knowledge of the facts in this case. This assertion appears premised on the trial judge's comments at the January 28, 2022 hearing concerning Lammers' motion to dismiss:

> All right. Counsel, we might as well do these together. It's the same issue on both of these. I have read and reviewed everything in this matter. I am familiar with the facts and circumstances. I actually, before I became a judge, had a secretary that lived on this road and would get flooded out periodically, so I am familiar with everything. I've read everything. I've reviewed everything. I would ask you to be brief.

In addition, the trial judge made the following statement at the January 6, 2023 hearing concerning the cross-motions for summary disposition:

> This is cross-motions [sic] for summary judgment. I have read and reviewed them. I am very familiar with the facts and circumstances. This is not the first time I've dealt with this out of that area. I have read and reviewed everything. Is there anything that [defense counsel] that [sic] you wish to add to your motions?

Critically, the trial judge's comments do not suggest that he had any previous knowledge of any *disputed* facts in the case. See MCR 2.003(C)(1)(c). The trial judge's initial comments show that he was familiar with flooding in the area, which was not in dispute. The parties agreed that the area was prone to flooding; this was why the Township was awarded the grant to purchase Lammers' property. Moreover, the trial judge's comments that he reviewed the parties' filings and was familiar with the facts and circumstances were made so that the parties would not simply reiterate the arguments already presented in their respective briefs.

We also reject Lammers' argument that the court's opinion and order concerning summary disposition showed disqualifying prejudice. Whether Lammers was entitled to the funds under the grant program considering the sales agreement's prohibition of duplicative benefits was a question the court had to decide in resolving the case. Similarly, the trial judge did not show bias by accepting the arguments and conclusions submitted by the Township. See *Armstrong v Ypsilanti Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001) (explaining that "[r]epeated rulings against a litigant, even if erroneous, are not grounds for disqualification").

Further, there is no evidence to support Lammers' additional assertion that the trial judge required the parties to appear in person at the disqualification hearing to intimidate and inconvenience Lammers and his counsel. Indeed, the judge allowed defense counsel to reschedule the hearing for a day on which she could attend. Lammers also argues that he was not permitted to be heard on the disputed issue of damages, but this is unsupported by the record. The Township moved for clarification of the judgment to specifically address the issue of damages. The trial court held a hearing concerning that motion, but defense counsel did not attend.

To the extent Lammers faults the trial court for holding this hearing because his counsel was unable to attend in person, we disagree. The court initially scheduled the disqualification hearing and clarification hearing on the same day. It specifically desired an in-person hearing on the disqualification motion, but defense counsel had this proceeding rescheduled because she could not appear in person. But defense counsel never sought to reschedule the clarification hearing, and she was permitted to appear via Zoom for this proceeding. Therefore, there is no record support for Lammers' contention that he was not given the opportunity to dispute damages.

For the foregoing reasons, although the trial court never ruled on Lammers' motion for disqualification, he has not established that such relief was warranted in this case. See *Olson v Olson*, 256 Mich App 619, 637; 671 NW2d 64 (2003).

E. SANCTIONS

Finally, Lammers asserts that the trial court erred by granting the Township's request for attorney fees as a sanction against him. We disagree.

We review the probate court's decision whether to award attorney fees and the determination of the reasonableness of the fees for an abuse of discretion. *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008). "The court does not abuse its discretion when its decision is within the range of reasonable and principled outcomes." *Id*. "A trial court's finding that an action is frivolous is reviewed for clear error." *John J Fannon Co v Fannon Prods, LLC*, 269 Mich App 162, 168; 712 NW2d 731 (2005) (quotation marks and citation omitted). "A

-14-

finding is clear error when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Estes Estate*, 207 Mich App 194, 208; 523 NW2d 863 (1994).

MCR 1.109(E) concerns the requirement that every filing provided to a court be signed by the party's attorney, or the party if he or she is self-represented. MCR 1.109(E)(2). In addition, MCR 1.109(E)(5) states the following in regard to the effect of a signature:

> The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:
>
> (a) he or she has read the document;
>
> (b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (c) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

If a party submits a filing that violates MCR 1.109(E)(5), the party is subject to sanctions.

> If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages. [MCR 1.109(E)(6).]

MCR 1.109(E)(7) also provides for sanctions for frivolous claims and defenses. MCL 600.2591 concerns the award of costs and fees in a frivolous action, which states:

> (1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.
>
> (2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.
>
> (3) As used in this section:
>
> (a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.

Further, MCR 2.119(E)(4)(b) and (c) mandate that a court "shall assess costs" against a movant who fails to appear at the relevant motion hearing without excuse.

The trial court did not err by awarding sanctions in this case. Defense counsel failed to attend the hearing concerning the Township's motion for clarification of the judgment. She also failed to attend the hearing for Lammers' motion for disqualification even after rescheduling it. And defense counsel then filed objections to a proposed judgment regarding the disqualification motion without submitting an alternate proposed judgment as required by MCR 2.602(B)(3)(c). Defense counsel also did not order the transcript for the disqualification hearing (that she did not attend), so she did not know what was said. And as discussed, Lammers' basis for disqualification is meritless regardless of defense counsel's failure to appear below, as are Lammers' excuses for not appearing.

The trial court did not make any ruling concerning the Township's request for sanctions until after Lammers filed objections to the proposed order. The court then awarded attorney fees to the Township to account for the time that the Township spent to attend the motion for disqualification and the motion for objections, which totaled $822.50. Lammers does not challenge the reasonableness of the attorney fees; as a result, we are not required to address it. Ultimately, we conclude the trial court's award of sanctions was within the range of principled outcomes and not an abuse of discretion under the instant facts. See *In re Temple Marital Trust*, 278 Mich App at 128.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young